IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SILVIANO TRUJILLO,

        Plaintiff,

v.                                       CIV 04-321 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Silviano Trujillo was born in 1949, speaks, reads and writes English, and has a high school education.  He has had a long history of high blood pressure, high cholesterol, and heart disease beginning from his late thirties.  His high blood pressure and cholesterol are treated with medication, but his heart condition resulted in four angioplasty and/or bypass surgeries over the course of a ten-year period – 1988, 1992, the mid-1990's, and June 1999, respectively. Despite his heart problems, he worked as a trailer mechanic and automobile paint and body worker for approximately twenty-five years until December 1999, when was fifty years old.  *See e.g., Administrative Record* ("*Record*") at 14-16, 53, 64, 68, 82, 111, 118.

Trujillo made an earlier application for benefits, but that application was not reopened by Administrative Law Judge ("ALJ") Paul J. Keohane.  The only application at issue is the one Plaintiff filed in May 2001, where he alleged an onset date of October 5, 1999.  Therefore, the relevant period in which Plaintiff must establish a disability is from the alleged onset in October 1999 through ALJ Keohane's January 2003 decision.  *See id.* at 15, 21, 53, 74; *see also Doc. 11*

at 1; *Doc. 12* at 1-2.

ALJ Keohane found that Trujillo has the residual functional capacity to perform a limited range of light work.  With the aid of testimony from a vocational expert, the ALJ identified three such jobs Trujillo can perform – food deliverer, candy cutter and news carrier.  He thus found Plaintiff not disabled at Step 5.  *See id.* at 19-20.  The Appeals Council declined review on February 27, 2004, thereby rendering the ALJ's decision final.  *See id.* at 4, 7.

This matter is before the Court on Plaintiff's motion to reverse or remand, where he asserts that four areas of the ALJ's analysis are erroneous.  *See Docs. 10, 11.*  Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  *See Docs. 2, 3.*   The entire record has been read and carefully considered.  Although I find no error in the ALJ's Step 2 analysis, I remand the matter to the Commissioner for further proceedings in connection with the Step 4 analysis.

# I.  Factual Background & Findings

### A.  June 1999 Heart Attack

Plaintiff's medical records begin in Spring 1998.  Those doctor visits were to check his cholesterol and blood pressure, neither of which were under control.  *See Record* at 171, 406, 160, 163, 164-66, 168, 171, 406.  Although Trujillo had a treadmill and wanted to start using it regularly, he was not exercising.  He was instructed by the doctor to start using it ten minutes daily and gradually increase the duration over time.  *Id.* at 163.

As of June 17, 1999, Plaintiff had been prescribed three medications for hypertension

(Metoprolol,[1] Cardura,[2] and Triamterene/HCTZ[3]) and Lipitor[4] to lower his cholesterol, but he had not been taking his medication.  That day he sought medical attention, apparently at an emergency room, complaining of fatigue, headache, "ringing" in his head, difficulty sleeping and lack of concentration.  He wondered if he was "depressed," and the doctor prescribed Zoloft.[5]  *Id.* at 159.

[1]      Metoprolol is prescribed for patients with high blood pressure (hypertension).  It is also used to treat chest pain (angina pectoris) related to coronary artery disease.  Metoprolol is also useful in slowing and regulating certain types of abnormally rapid heart rates (tachycardias).  Other uses for metoprolol include the prevention of migraine headaches and the treatment of certain types of tremors (familial or hereditary essential tremors).

www.medterms.com.

[2]  "Cardura is used for the control of elevated blood pressure (hypertension) and for benign prostatic hyperplasia (noncancerous enlargement of the prostate gland)."  www.medterms.com.

[3]      This medication is currently only available in combination with another diuretic called hydrochlorothiazide.  This medication is a mild diuretic and blood pressure-lowering (antihypertensive) medication which reduces the potassium loss occurring with its combined drug hydrochlorothiazide. . . . This medication combination is used for the treatment of elevated blood pressure (hypertension) and is a diuretic.

www.medterms.com.

[4]  "Atorvastatin [brand name 'Lipitor'] is used for the treatment of high cholesterol and triglyceride levels."  www.medterms.com.

[5]      Selective serotonin inhibitors block the reuptake of serotonin and therefore change the level of serotonin in the brain.  It is believed that some illnesses such as depression are caused by disturbances in the balance between serotonin and other neurotransmitters.  The leading theory is that drugs such as sertraline [brand name 'Zoloft'] restore the chemical balance among neurotransmitters in the brain. . . . .

* * * * *

Sertraline is a drug that is used to treat depression, obsessive-compulsive disorder, panic disorder, and post-traumatic stress disorder. Like other SSRIs, sertraline also is used for treating social anxiety disorder . . . .

The very next day however, Plaintiff returned to the hospital with radiating epigastric pain, nausea, and vomiting.  He was experiencing a heart attack and underwent an immediate angioplasty.  *See id.* at 114-16, 118-23.  Upon discharge, Trujillo was prescribed Metoprolol, Cardura, and Lipitor as before, along with Ecotrin,[6] Zantac,[7] Lisinopril[8] and a low sodium, low cholesterol diet.  Plaintiff was also discharged with instructions to "gradually resume his activity lifting no more than 10 lbs over the next week."  *Id.* at 117.

---

* * * * *

The most common side effects of sertraline are sleepiness, nervousness, insomnia, dizziness, nausea, tremor, skin rash, upset stomach, loss of appetite, headache, diarrhea, abnormal ejaculation, dry mouth and weight loss. Important side effects are irregular heartbeats, allergic reactions and activation of mania in patients with bipolar disorder.

If sertraline is discontinued abruptly, some patients experience symptoms such as abdominal cramps, flu like symptoms, fatigue and memory impairment. Although this reaction is not well established, it is reasonable to gradually reduce the dose when therapy is discontinued.

It has been suggested that SSRIs may cause depression to worsen and even lead to suicide in a small number of patients.

www.medterms.com.

[6]  Ecotrin is one of the brand names of aspirin.  *See* www.medterms.com.

[7]  Ranitidine [brand name 'Zantac'] blocks the action of histamine on stomach cells, and reduces stomach acid production.  Ranitidine is useful in promoting healing of stomach and duodenal ulcers, and in reducing ulcer pain. Ranitidine has been effective in preventing ulcer recurrence when given in low doses for prolonged periods of time. In doses higher than that used in ulcer treatment, ranitidine has been helpful in treating heartburn and in healing ulcer and inflammation of the esophagus resulting from acid reflux (reflux esophagitis).

www.medterms.com.

[8]  "Lisinopril is used to treat elevated blood pressure and heart failure."  www.medterms.com.

4

Although he was not discharged with a prescription for Zoloft, evidently Plaintiff still had his prescription from the day before his heart attack and at some point tried taking it. He took only three doses however, and then quit taking the antidepressant because he claimed that it upset his stomach. *See id.* at 158. It also appears that Trujillo continued taking the Triamterene/HCTZ that was prescribed before his heart attack.[9]

Plaintiff reported his discontinuation of Zoloft at a doctor visit approximately three weeks after his surgery. At that time he also was noncompliant with his other medications because he complained of "too many side effects." Trujillo said he was feeling "weird" and teary, was having periods of disorientation, and had pain in his right calf after walking 150 yards. *Id.*

At this June 14, 1999 visit, the doctor counseled Plaintiff on his medications and "reinforced" that Plaintiff should comply with them. He wanted Plaintiff to follow up with another doctor and possibly a vascular surgeon regarding his leg pain. He refilled the prescription for Triamterene/HCTZ and switched Plaintiff's antidepressant to Trazodone.[10] *Id.*

---

[9] *See Record* at 158 (listing among current medications "Maxide," which is a brand name for Triamterene/HCTZ per the PHYSICIANS' DESK REFERENCE 731 (53rd ed. 1999)).

[10]       Trazodone is an oral antidepressant drug that affects the chemical messengers (neurotransmitters) within the brain that nerves use to communicate with (stimulate) each other. . . . Although the exact mechanism of action of trazodone is unknown, it probably improves symptoms of depression by inhibiting the uptake of serotonin by nerves in the brain. This results in more serotonin to stimulate other nerves. Trazodone also may increase directly the action of serotonin. Trazodone is chemically unrelated to the serotonin reuptake inhibitors (SSRIs) [e.g., Zoloft] . . . .

                              * * * * *

. . . Trazodone is primarily used for the treatment of depression; however, it is sometimes prescribed as a sedative, and it also is used in combination

Plaintiff returned to work as a trailer mechanic and "body man," where his responsibilities included disassembling and assembling trailers, body repairs, brake jobs, riveting, welding, drilling and painting. *See id.* at 82, 85. He could lift ten pounds frequently and twenty pounds with help, and he worked eight hours a day, thirty-two to forty hours a week. *Id.* at 85.

Trujillo told one of the consulting examining physicians that he "stopped working because of his anxiety and his back pain [and] that he was actually terminated from work." *Id.* at 135. He testified that he quit working because his back hurt him and because his anxiety makes him dizzy. *Id.* at 248-49. Since his last heart surgery, every checkup showed that his heart was "okay" and that his hypertension was controlled by medication. Nevertheless, Plaintiff testified that he was frequently tired such that he needed to rest four times a day for half an hour. *Id.* at 250-54. He further testified that he experienced episodes of anxiety which caused him to eat because it seemed like his blood sugar was low, but that the anxiety then worsened after eating: "I get like I'm afraid. So I go down lay down. . . . Dizzy and afraid." *Id.* at 253-54. Trujillo testified that his fear resulted from the knowledge that he is at high risk for another heart attack based upon what his doctors told him in June 1999. *See id.* at 271.

### B. August 2000 Complaint Of Anxiety

There are no medical records for the period between July 1999 and August 2000. Moreover, there is no explanation for the gap even though Plaintiff alleges that he became disabled on October 5, 1999, toward the beginning of this time frame. His medical records begin

_____

with other drugs for the treatment of psychiatric conditions other than depression and cocaine withdrawal.

www.medterms.com.

again on August 9, 2000, when Plaintiff visited the University of New Mexico Medical Center for

the first time to establish care there.  *Id.* at 131.

At that visit, Plaintiff reported to Dr. Judi R. Voelz his history of coronary artery disease,

hyperlipidemia, and ear problems that included hearing loss, tinnitus, dizziness and poor balance,

*id.* at 131-32.  Trujillo also indicated that he suffers from

> [p]anic attacks and agoraphobia.  The patient states throughout his
> last years being an anxious person and tends to go through period
> where he becomes so anxious that he is unable to leave his home
> and is currently feeling these symptoms.  He has recently lost his
> job secondary to this and is seeking medication or counseling with a
> psychologist for this purpose.  He also has a number of phobias.
> He in unable to fly in an airplane secondary to anxiety and panic
> attacks and most recently he has noted that he is unable to drive in
> a vehicle unless it is driven by a member of his family.  The patient
> is currently on no medications for this but in the past has received
> anxiolytics with minimal effects.

*Id.* at 131.  Dr. Voelz's plan was for Plaintiff to stay on his current medications for heart disease,

cholesterol and hypertension.  Trujillo was to consult with an ear nose and throat specialist to see

if "there may be a treatment that we could offer him,"  because Plaintiff reported that the

symptoms were getting worse although the ear problems were "not limiting his functional ability

at this stage." *Id.* at 133-33.  Among other things, Dr. Voelz ordered a thyroid test to determine if

it was related to his anxiety, prescribed the antidepressant Paxil,[11] and referred Plaintiff to the

UNM Mental Health Center (hereinafter "MHC").  *See id.* at 132-33.

Two weeks later Plaintiff returned for the results of his tests.  He had not yet heard from

the MHC, and told Dr. Voelz that he had stopped taking the Paxil she prescribed because it made

---

[11]  "Paroxetine [brand name Paxil] is an anti-depressant drug . . . in a class of drugs called
selective serotonin reuptake inhibitors (SSRIs)."  www.medterms.com

him more anxious.  She was concerned because his blood pressure was again elevated as it had

been on his previous visit.  *Id.* at 128.  Dr. Voelz noted that Plaintiff "is usually very anxious at

these visits and this may be the cause of these constant elevations." *Id.*  She nonetheless wanted to

rule out another possible physiological cause[12] for the anxiety and contacted MHC because she

felt that Trujillo needed to be seen there "fairly urgently." *Id.*

Indeed, the very next day Plaintiff was seen at MHC.  His chief complaints were anxiety,

fear, dizziness, lack of concentration and social phobias.  *See id.* at 207.  Dr. Voelz's notes from

Plaintiff's first visit indicate her understanding that the anxiety was of relatively recent origin.  In

contrast, however, Plaintiff told MHC that he had been "feeling bad for a long time," and that he

has had anxiety and social phobias "off and on all my life" or at least since high school.  *Id.* at 207,

211.

Trujillo also told MHC that he was "afraid to go to work."  *Id.* at 211.  He also indicated

several areas on the "Basis-32 Behavior And Symptom Identification Scale" where he was having

"quite a bit" or "extreme" difficulties.[13]  MHC assessed Plaintiff and found that he suffered from

"anxiety, social phobia, unresponsive to Paxil," but was not in danger or acute distress.  *Id.* at

---

[12]        Pheochromocytoma is a rare tumor with excess production of adrenaline
and derives from the inner layers of the adrenal glands.  The symptoms of
pheochromocytoma are due to the high levels of adrenaline.  These
symptoms include palpitations, weight loss, sweating, and high blood
pressure (sometimes severe high blood pressure).  Without adequate
treatment, the severe high blood pressure can lead to stroke and heart
attack.

www.medterms.com.

[13]  The areas included:  handling money; making decisions; completing tasks; recreational
activities; getting along with people outside the family; feeling lonely; goals or directions in life; self
confidence; apathy; depression; hopelessness; fear; anxiety; concentration; mood swings; and feeling
satisfaction with life.  *Record* at 208-10.

207; *see also id.* at 211.  This visit was Plaintiff's sole visit to MHC.[14]  A few months later he

visited the ear specialist, who was of the opinion there was no "treatment" for Plaintiff other than

to try a hearing aid.  *See id.* at 126-27.

> ### C.  Medical Records After Application For Benefits – Consulting Examining
> ### Doctors' Reports Are Inconclusive Regarding Plaintiff's Heart Condition

After his October 2000 visit to the ear specialist, another gap appears in Plaintiff's medical

records.  The next time the record indicates that Trujillo visited a doctor was several months after

he filed his May 2001 application for disability benefits alleging the heart condition, back

problems, anxiety, dizziness, and leg and hearing problems.  *See, e.g., id.* at 53, 65, 70, 72.  The

medical records from Plaintiff's treating physicians for these two visits in August and October of

2001, do not mention Plaintiff complaining of anxiety or depression.  He also denied any

symptoms indicative of heart problems.  *See id.* at 149-50, 154.

In late October and early November 2001 respectively, the Administration had Dr. Eugene

Toner perform a physical examination of Plaintiff, and had Dr. Rene Gonzales perform a

psychological examination.  Both doctors declined to give an opinion about the impact of

Plaintiff's heart condition on his ability to do work.

Dr. Toner's report concerns three areas – the condition of  Plaintiff's heart, back and

hearing.  Plaintiff did mention his anxiety to Dr. Toner, but the physician noted Plaintiff was to

have a consultative examination with a psychiatrist to evaluate that condition, and he deferred any

decision to that specialist.  *See id.* at 134, 137.

---

[14]  The MHC records contain an August 30, 2000 "To Whom It May Concern" letter that states
the staff "has been trying to contact you . . . to assist you in deciding which mental health services will be
most appropriate for your immediate needs."  *Record* at 206.  It is unclear both whether this letter relates to
Plaintiff and whether it was sent to him.

Dr. Toner found that Plaintiff was limited in his hearing "due to decreased hearing response, which may interfere with his ability to communicate normally in the workplace." *Id.* at 137; *see also id.* at 142.  On the other hand, Dr. Toner found Plaintiff's complaints about "back problems . . . in excess of objective findings."   His examination and the x-rays showed "no evidence of any structural abnormality and no evidence of any abnormality either on range of motion, strength, or sensory testing to the lower extremities."  *Id.* at 137; *see also id.* at 136.

Finally, Dr. Toner administered an EKG test which "show[ed] a history of an old inferior myocardial infarction, the QRS interval is at the upper limits of normal, and ***it looks as if he may have an incomplete left bundle branch block.***  There is no evidence of any acute ischemic changes."  *Id.* at 136 (emphasis added).  His assessment and conclusions concerning Plaintiff's cardiac status are circumspect:

> Cardiac bypass with no evidence of cardiac failure and no evidence of angina ***at today's visit.***
>
> * * * * *
>
> This claimant's biggest problem as far as his physical health is concerned appears to be his cardiac status.  ***I feel that his cardiologist needs to indicate how much work he can do.***  He has been asymptomatic, however, his three-vessel bypass has needed angiography within the last 2-3 years.

*Id.* at 136-37 (emphasis added).

Dr. Toner's "Medical Source Statement Of Ability To Do Work-Related Activities" either reflects the doctor's inability to reach a conclusion about how Plaintiff's heart condition impacts his ability to work, or it is contradictory.  Dr. Toner indicated that Plaintiff is not limited in his ability to lift, carry, stand, walk, sit, reach, handle, speak, travel and manipulate.  Yet he also

suggested that there is a "medical basis" to limit those activities, and that Plaintiff "may have difficulty sustaining activity over 8 h[our] period." *Id.* at 141-42. This statement seems to reflect Dr. Toner's belief that any determination about Plaintiff's stamina and abilities vis-a-vis his heart condition should be deferred to Plaintiff's cardiologist. Dr. Gonzales, the consulting psychiatrist similarly deferred to Plaintiff's treating physicians regarding the prognosis for his physical abilities. He characterized Plaintiff's prognosis for physical abilities "guarded . . . depending on the findings from the internist." *See id.* at 146.

As for his "psychiatric problems," Dr. Gonzales found Plaintiff's prognosis "good." *Id.* Plaintiff reported to Dr. Gonzales that he has suffered from anxiety "all his life," is anxious "most of the time," sometimes experiences panic attacks, and feels depressed because of his physical problems. On the other hand, Dr. Gonzales noted that Trujillo has never been hospitalized for his mental condition, never seen a counselor, and quits taking medication he has been prescribed because they make his condition "worse." *Id.* at 144.

Dr. Gonzalez found Plaintiff's "[m]ood appeared to be depressed, sad, and anxious," his concentration and attention mildly impaired, and his "IQ appeared to be low." *Id.* at 145. He diagnosed Plaintiff with "not otherwise specified" anxiety and depression, with a present GAF of 50 and for the past year 65. *Id.* at 144-46. Dr. Gonzales further concluded that Plaintiff's mental condition posed either no or mild limitations in functioning.

> CONCLUSION: Silviano Trujillo has been diagnosed with anxiety disorder NOS and depressive disorder NOS. He is able to take care of his basic activities of daily living. He had never had any legal problems. He has been able to manage his own financial affairs. In the mental status examination, it showed that he was in a depressed and anxious mood. He was not suicidal or homicidal. He was not a threat to himself and to others. He was not psychotic. In the

> psychiatric psychological source statement of ability to do work-
> related activities (mental-MSS), in understanding and remembering
> instructions, detailed or complex instructions, mild limitations; very
> short and simple instructions, no limitations; sustained
> concentration and task persistence, ability to carry out instructions,
> and ability to work without supervision, no limitations; ability to
> attend and concentrate, mild limitations; social interaction, ability to
> interact with the public, coworkers, and supervisors, mild
> limitations[;] adaptation, ability to adapt to changes in the
> workplace, mild limitation; ability to be aware of normal hazards
> and react appropriately and ability to use public transportation or
> travel to unfamiliar places, no limitations.

*Id.* at 146.

The initial Residual Functional Capacity Assessment and Psychiatric Review Technique forms completed by agency physicians found that Trujillo was not disabled, and that he could perform light work. Based on these assessments, Plaintiff's claim was initially denied in December 2001. *See id.* at 32-33, 179-86, 187-99.

One month after requesting reconsideration of that decision, Plaintiff followed up with the doctor monitoring his cholesterol. *See id.* at 37, 221-22. Trujillo denied any physical problems at that visit, but did complain of

> depression and occasionally some anxiety. He has been
> experiencing that since he was a child. He has been on medications
> in the past although he is uncertain what medications he has been
> on. He reports some improvement for a short period of time and
> then he develops 'immunity' to them. He has not seen a
> psychiatrist for several years. He reports the depression seems to
> be worsening over the last year and a half. He denies and SI or HI.
> He denies any feelings of crying although he reports decreased
> motivation.

*Id.* at 221. The doctor prescribed Zoloft and "discussed with patient that he needed to seek some therapy and treatment. Call Kaseman or his insurance to get a psychiatrist referral." *Id.* at 222.

Again, Plaintiff did not take the antidepressant as prescribed . It also appears that he did

not begin therapy at that time.  A month after his request for reconsideration was denied, he again visited the doctor to follow up with monitoring his cholesterol and again complained of

> depression that he has had in the past.  He was tried on Zoloft recently and reports that he stopped taking it after a few days because he felt that his depression was getting worse and he blamed it on the medication.  He has been treated for depression in the past although he is uncertain what medications he has tried in the past.  He denies any SI or HI today although he has a h/o depression.  No suicide or hospitalizations.  No family h/o depression in the past.

*Id.* at 219; *see also id.* at 31, 39, 43, 186, 199.  The doctor observed that Plaintiff's "[a]ffect is flat," but that he "answers questions appropriately."  *Id.* at 220.  He discussed Plaintiff's noncompliance with instructions, and again asked Plaintiff to "follow-up with psych."  *Id.* at 220.  Soon thereafter, in early May 2002, Plaintiff did so at the Presbyterian Medical Group, but the notes from that visit to a Dr. "Gonzales" are largely illegible.  It seems that Plaintiff was prescribed the antidepressant Celexa.[15]  *See id.* at 215-16.  The notes for his next visit there, almost two months later in late June 2002, are equally illegible, but could be read as diagnosing depression and increasing the Celexa.  *See id.* at 213-14.

The first hearing before ALJ Keohane in August 2002 was canceled because Plaintiff forgot to wear his hearing aid and because counsel wanted to submit additional medical records, including psychiatric records.  *See id.* at 226-32.  At the October 2002 hearing, Plaintiff testified that he had been seeing Dr. "Gonzales" once a month for over a year.  *See id.* at 252-53.  However, the record does not reflect that Plaintiff continued with the psychological counseling that summer or fall with Dr. Gonzales at Presbyterian.

---

[15]  "Citalopram [brand name Celexa] is an antidepressant medication that affects neurotransmitters, the chemical transmitters within the brain."  www.medterms.com

Additionally, an updated medical form submitted by Plaintiff at the hearing stated that Dr. Rene Gonzales, the consulting psychiatrist, "first prescribed" Wellbutrin for Plaintiff only a few weeks earlier, on October 3, 2002. *See id.* at 2, 112. However, none of Plaintiff's pre-hearing submissions show the consulting psychiatrist Dr. Rene Gonzales as a treating psychiatrist or Wellbutrin as a prescription. Moreover, the record contains no treatment notes from Dr. Rene Gonzales. Instead, the record contains only his examining consulting report based on the single Administration-scheduled visit. *See id.* at 66-67, 69-70, 72, 99, 105-06, 108-110. I therefore conclude that the "Dr. Gonzales" Plaintiff was seeing for his mental condition was the Dr. Gonzales at Presbyterian.

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief. *E.g., Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003). My assessment is based on my "meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *Hamlin,* 365 F.3d at 1214; *see also Langley,* 373 F.3d at 1118. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214 (same); *Doyal,* 331 F.3d at 760 (same). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record of if there is a mere scintilla of evidence supporting it." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214 (same).

14

# II.  Analysis

### A.  ALJ Did Not Err In His Step 2 Analysis

### (1)  Anxiety And Depression As Nonsevere

Plaintiff's fear of working after his last heart attack would be understandable, but that is not what he asserted.  Trujillo instead claimed – to his treating doctors, to consulting psychiatrist Gonzales, in his testimony and through that of his relatives – that his anxiety is long-standing. ALJ Keohane made detailed findings in concluding that Plaintiff's anxiety and depression were not "severe."  Those findings provide in full:

> In July 1999, the claimant reported that he felt depressed.  He had quit taking his medication after three doses due to gastrointestinal upset (Exhibit 5F, p. 12).  In August 2000, the claimant went to the intake department of a medical center.  He stated that he had feelings of anxiety with dizziness and feelings for fear.  However, he admitted that he had had anxiety "off and on" since high school. And, he reported that an antidepressant medication had made his symptoms worse.  There is no indication that the claimant received any counseling or new medications at that time (Exhibit 14F, p. 2).
>
> **Despite the claimant's report of prolonged and severe psychological symptoms, I emphasize the fact that he was able to perform skilled worked from 1985 to 1999** (Exhs. 4E and 9E).
>
> In November 2001, Dr. Rene Gonzales, a consulting psychiatrist, evaluated the claimant regarding his reported anxiety and panic attacks which he had "all his life."  The claimant stated that he was anxious "most of the time" and he was depressed.  However, he had never seen a psychologist, psychiatrist, or a mental health counselor and he was never hospitalized for anxiety or depression. Also, he had never been hospitalized for any psychological disorder and he had tried medication only once in the past.  Dr. Gonzales' mental status examination showed that the claimant had a depressed and anxious mood.  Additionally, Dr. Gonzales concluded the claimant had only "mild" limitations in understanding and remembering detailed or complex instructions.  Also, he had no limitations working with very short and simple instructions,

carrying out instructions and he had only "mild" limitations with attending and concentrating, social interaction and working with others.  Dr. Gonzales concluded that the claimant's prognosis was "good" if he participated in individual therapy and consulted a psychiatrist for medication management (Exhibit 4F).  Thus, Dr. Gonzales opined that the claimant's anxiety and depression were amenable to treatment.

Moreover, in November 2001, a state agency psychologist determined that the claimant's depression and anxiety were not "severe" disorders based on the medical record.  Specifically, this psychologist reported that the claimant had only "mild" limitations regarding his daily living activities, his social functioning, and his ability to maintain concentration, persistence, and pace.  Moreover, the claimant had not had repeated episodes of decompensation of extended duration (Exhibit 8F).

In April 2002, Dr. George Dayana reported that, although the claimant had a flat affect, he answered questions appropriately.  Dr. Dayana assessed depression and anxiety.  He told the claimant that, since he had been noncompliant with his medications, he should follow up with a psychiatrist.  Dr. Dayana did prescribe Zoloft, an antidepressant medication at that time (Exhibit 15F, pp. 7-8).

In May 2002 and June 2002, the claimant consulted Dr. Gonzalez for his feelings of hopelessness, helplessness, and sadness.  Dr. Gonzales prescribed a different medication.  His writing is somewhat illegible; but, he instructed the claimant to return in either one or two weeks or one or two months (Exhibit 15F).  In any event, there are no subsequent medical records in the file.

At the hearing, the claimant testified that he sees Dr. Gonzales once a month and he had seen Dr. Gonzales in October 2002.  He is currently taking Wellbutrin for his depression (Exhibit 10E).  However, there are no reports from Dr. Gonzales after June 2002.  In addition, the claimant testified that he has to lie down four times per day for one-half hour at a time due to his anxious feelings.  However, I find that this testimony is not supported by the underlying medical record.  I further find that the claimant has not had "severe" anxiety or depression in this case.

*Record* at 16-18.

16

Plaintiff contends that ALJ Keohane erred in finding that his anxiety and depression were not "severe" impairments at Step 2 because his treating physicians have noted those conditions and prescribed medication for it. He further asserts that his testimony and that of his family must be considered in this regard. *See Doc. 11* at 4-8.

However, at Step 2 of the sequential analysis, the claimant bears the burden of showing, by medical factors alone, that his or her alleged mental impairment "significantly limits" a "basic work activity." If the claimant does not meet that showing, the ALJ can deny benefits for the asserted condition without continuing on to the next steps of the analysis. *E.g., Langley,* 373 F.3d at 1123; *Eden v. Barnhart,* ___ Fed. Appx. ___, ___, 2004 WL 2051382 at *2 (10th Cir. 9/15/04); *Cainglit v. Barnhart,* 85 Fed. Appx. 71, 73 (10th Cir. 2003); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1520a(d)(1), 404.1521(a). The regulations define "basic work activities." Those activities that pertain to mental impairments are: "Understanding, carrying out, and remembering simple instructions"; "Use of judgment"; "Responding appropriately to supervision, co-workers and ususal work situations"; and "Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b)(3)-(4); *see also Eden,* 2004 WL 2051382 at *2; *Cainglit,* 85 Fed. Appx. at 73.

While Plaintiff contends that Dr. Voelz's observations about his anxious state during his doctor visits are evidence of a mental impairment that affects his functioning, in fact she made no such findings. The only observation Dr. Voelz made about limitations had to do with Plaintiff's ear problems, and in that regard she stated that those problems were "not limiting his functional ability at this stage." *Id.* at 133. Here, no doctor, treating or otherwise, has assessed Plaintiff's mental impairments as significantly limiting basic work activities. Indeed, Dr. Rene Gonzales, the

only physician to render an opinion on limitations, concluded to the contrary.

Plaintiff asserts that Dr. Gonzales' findings on Plaintiff's limitations are suspect because he gave him low GAF scores and the scores are "evidence of serious symptoms indicating problems keeping a job." *Doc. 11* at 5; *see also id.* at 6. However, GAF scores can indicate problems unrelated to the ability to hold a job. Because Dr. Gonzales explained his reasons why Plaintiff's mental condition does not severely limit his ability to perform work-related tasks, the GAF scores are neither inconsistent with his other conclusions nor evidence of a "severe" impairment.[16]

Plaintiff further maintains that ALJ Keohane based his Step 2 finding "in part because [Plaintiff] was noncompliant with his medications." *Doc. 11* at 6. However, I read the above findings to focus on the lack of medical evidence establishing limitations in functioning, and not as a basis for finding Plaintiff's mental conditions nonsevere because of his failure to follow prescribed treatment. *Compare Doc. 13* at 2, *with Doc. 12* at 6. In any event, even if Plaintiff failed to take antidepressants regularly because of adverse side effects, that fact does not establish

---

[16] *E.g., Zachary v. Barnhart,* 94 Fed. Appx. 817, 819 (10th Cir. 2004) ("A GAF of 45 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning.' AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). Dr. Mynatt's finding that Ms. Zachary's present level of functioning was 45 did not include any explanation for giving her that rating and did not indicate that Ms. Zachary was unable to work. Ms. Zachary's GAF score of 45 may indicate problems not necessarily related to her ability to hold a job, *see id.,* and therefore standing alone, without any further narrative explanation, this rating does not support an impairment seriously interfering with her ability to work.");*Cainglit,* 85 Fed. Appx. at 75 ("A GAF score of 41-50 indicates '[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning,' while a GAF score of 31-40 indicates '[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work, school, family relations, judgment, thinking or mood.' . . . A GAF score of 39-45 thus may indicate problems that do not necessarily relate to one's ability to work. . . . In this case neither Dr. Ball nor the MHSSO counselors stated that Ms. Cainglit's depression would interfere with her ability to work. . . . Rather, they noted problems with her family and social relationships. . . . In the absence of any evidence indicating that Dr. Ball or the MHSSO assigned these GAF scores because they perceived an impairment in Ms. Cainglit's ability to work, the scores, standing alone, do not establish an impairment seriously interfering with Ms. Cainglit's ability to perform basic work activities.").

the requisite limitations in functioning to meet his burden at Step 2.

Plaintiff also faults the ALJ for emphasizing that Plaintiff had worked for decades despite his depression and anxiety. *Doc. 11* at 7. However, that observation is accurate and does not constitute error. *See, e.g., Knight v. Barnhart,* 68 Fed. Appx. 958, 920 (10th Cir. 2003) ("Claimant . . . asserts that the ALJ erred in determining that his right eye blindness was not a severe impairment at step two of the applicable analysis. A severe impairment is one which significantly limits a claimant's ability to do basic work activities. . . . The ALJ's conclusion that this impairment is not severe was supported by claimant's own testimony that he was gainfully employed after surgery on his eye. We perceive no error in the ALJ's step two determination.").

### (2) Dizziness Was Considered Severe

Plaintiff next contends that ALJ Keohane failed to find that Trujillo's dizziness is a severe impairment. *Doc. 11* at 8-10. The record does not bear out this assertion. Although ALJ Keohane did not specifically mention dizziness at Step 2, he did  include that condition in his residual functional capacity assessment as well as his in his hypothetical to the vocational expert:

> [Plaintiff] did testify regarding **persistent dizzy spells. I resolve doubts in the claimant's favor** and find he has had "severe" coronary artery disease.
>
> **Given the claimant's dizzy spells coupled with his hearing impairment, I find he cannot work near heights or other work hazards [or] climb stairs during the period at issue.**
>
> . . . I find he retains a residual functional capacity for a limited range of light work on a sustained basis. Specifically, I find that he can . . . perform the postural maneuvers except for climbing, and he cannot work around hazards or noise.

*Record* at 19; *see also id.* at 273 (ALJ hypothetical to vocational expert includes limitations

climbing occasionally and avoiding concentrated exposure to noise and hazards); *id.* at 278
(counsel clarifying first hypothetical to add "the additional limitation of being dizzy/nauseated
requiring him to lay down for 30 minutes").

If an ALJ does not rule out an impairment as severe at Step 2 and goes on to consider it in
the residual functional capacity analysis, there is no error. *E.g., Gonzales v. Secretary of Health
& Human Servs.,* 1994 WL 413310 at *1 (10th Cir. 1994) (affirming decision of this Court where
ALJ did not rule out mental impairment at Step 2 and went on to consider the condition at issue in
Step 4 analysis); Grant v. SSA, CIV 02-1166 KBM (*Doc. 17* at 5-6 & n.2; ALJ failure to mention
condition at Step 2 held harmless where ALJ considered the condition in Step 4 analysis).
Accordingly, I find the Step 2 argument concerning dizziness unavailing.

### B.  Residual Functional Capacity Assessment

I find no error in ALJ Keohane's Step 2 findings, and Plaintiff raises no issue with regard
to his Step 3 findings.  However, I find a Step 4 issue dispositive of the remainder of the claims.

It is true that the discharge records after his last heart surgery advised Plaintiff to
"gradually resume his activity lifting no more than 10 lbs over the next week."  *Record* at 117.
Plaintiff returned to work after his last heart attack, but the records from other treating physicians
neither impose any work limitations on him nor discuss the extent of any limitations that Plaintiff
has due to his heart condition.  Instead, these record merely relate that with the exception of
dizziness, Trujillo has not experienced adverse acute cardiac symptoms.

Generally, the duty to develop the record rests with the Administration, not the claimant.
*E.g., White v. Barnhart,* 287 F.3d 903, 908 (10th Cir. 2001).  Under 20 C.F.R. §§404.1512(e)-(f),
if the medical information at hand is incomplete or inadequate, the Administration is to first

20

recontact the treating sources and, if those efforts are unavailing, then to order a consultative examination.

The Administration did send Plaintiff for consultative examinations.  I disagree, however, with the Commissioner's characterization of these reports.  In my view, both of the consulting examining physicians expressly *declined* to give an opinion about limitations due to the heart condition and left that determination to his cardiologist.  The consulting sources' preference for a specialist treating opinion finds support in the regulations:

> opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant.  *Williams,* 844 F.2d at 757;  *see also* 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(d)(1), (2); *see also* SOC. SEC. R. 96-6p, 1996 WL 374180, at *2.  The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)).  The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.  20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2); SOC. SEC. R. 96-6p, 1996 WL 374180, at *2.

*Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004) (internal quotations omitted); *see also* 20 C.F.R. § 1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Both Dr. Toner and Dr. Gonzales were plainly concerned about Plaintiff's cardiac status. Dr. Gonzalez used the term "guarded" to describe Plaintiff's prognosis.  As I read his report, Dr.

Toner found some blockage though no problems at that time.  However, he specifically pointed out that even though Trujillo was then "asymptomatic," only two to three years elapsed between the time he had a bypass and when he needed a subsequent angiography.  Thus, Dr. Toner's report does not imply, as the Commissioner suggests, that Plaintiff is "fine" three years after his 1999 surgery.  Rather, it implies that Plaintiff may be getting to a point where his heart condition will again become problematic.

Therefore, even though the Administration made efforts to complete the record, after doing so it was in no better position to evaluate Plaintiff's cardiac status than it had been with the treating medical records it had amassed.  The only medical records in this case from Plaintiff's cardiologist appear to be the 1999 discharge summary.  It is unclear whether there are no other records from the cardiologist, or whether they were overlooked because Plaintiff has switched primary care providers several times.

The matter before me is in an unusual posture.  The consulting examining physicians informed the Administration that the record is inadequate to make a residual functional capacity assessment based on Plaintiff's cardiac status.  Under these unique circumstances, I conclude that the Administration should have recontacted Plaintiff's cardiologist to "determine whether the additional information we need is readily available."  20 C.F.R. § 404.1512(e)(1).

I recognize that after recontacting the appropriate cardiologist or cardiologists, ALJ Keohane may be in no different position with regard to evidence of Plaintiff's cardiac-related limitations.  Even so, I still remand the case on this point because his decision does not discuss Dr. Toner's findings in their entirety, and focuses only on the findings that support a conclusion of nondisability.  "The ALJ is not entitled to pick and choose from a medical opinion, using only

those parts that are favorable to a finding of nondisability." *Robinson,* 366 F.3d at 1084. That failure is particularly relevant here, where the ALJ evidently fully credited the nonexamining agency physicians' opinion of Plaintiff's residual functional capacity.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 10)* is GRANTED IN PART. The decision of the Commissioner is affirmed through the Step 2 findings, but remanded for further proceedings from the physical residual functional capacity assessment stage, including recontacting Plaintiff's cardiologist, holding another hearing, and calling another vocational expert. A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.